Brown v. St. Clair Anesthesia, Ltd. 5-14-0251 Mr. Manana Mr. Manana, you may proceed to serve. May it please the Court, Counsel. In this case, the trial court committed a reversible error when it systematically, arbitrarily, and unreasonably deprived Dr. Gillum of his right to a jury trial. Dr. Gillum was deprived of his right to have the jury decide the scope of the consent. Dr. Gillum was deprived of his right to have the jury decide causation. The right to jury trial is invalid and only the trial court denied Dr. Gillum this right. The denial of the right to jury trial was compounded by a series of prejudicial evidentiary rulings. It was prejudicial error to not allow cross-examination of an expert with materials that the expert did not agree with. It was prejudicial error to not allow use of medical records at trial that had been stipulated as medical records by the parties. It was prejudicial error to not allow Dr. Gillum to testify to opinions that he had disclosed in his discovery deposition pursuant to Rule 213. And it was prejudicial error to not allow Dr. Gillum to testify to the facts that he observed during the procedure as an eyewitness. On the first point, on the motion for summary judgment, the appellee's brief, the submissions that include that brief, were not even before the court when the court granted the summary judgment. Let me ask a question about that. Did the court grant the summary judgment basically asserting that the consent must be in writing? Well, that seemed to be a part of the ruling. It was not clear all of the reasons for the ruling. Certainly, that was an argument proffered by the plaintiff in the underlying case. There is certainly no support for that argument. This court in both Grant and Hernandez, two courts on this very issue, discussed at length the oral testimony of the physician and the patient in the informed consent discussion, therefore demonstrating that the oral evidence is entirely appropriate. I guess that's what I'm getting at. I mean, does the record reflect that the trial court in granting the motion for summary judgment said a consent must be in writing, and this one's not, therefore I'm granting summary judgment? It's not that clear. It's not that clear, and there were different points. Even if you wanted to say that the consent had to be in writing, there was a consent in writing. I understand. And that's another point that goes to the motion for summary judgment, because then the issue there is what is the scope of that consent? And again, Illinois case law is abundantly clear. It's not even controverted here that the scope of the consent is a question that is determined by the jury. The plaintiff's argument seems to be a complete reversal of the standard for summary judgment. The plaintiff's position is let's disregard the defendant's evidence and look at only the plaintiff's argument in theory, and then grant plaintiff summary judgment. Of course, that would vitiate the whole essence of summary judgment. If you look at the evidence in the light most favorable to the nonmoving party as required by summary judgment law, the defendants presented three different experts who would or could have testified to the scope of the consent. Whether a central venous pressure line and a swan gans catheter are substantially similar, that is not within the province of a common lay jury. I suspect that unless the court has medical degrees, the court does not know that. I do not know that. The jury certainly does not know that. And that requires expert testimony. And the defendants had three experts who did testify in either deposition or affidavit that this was substantially similar. So there is certainly no credible evidence that would have allowed a summary judgment against the defendants in that case. It's prejudicial error in a battery case where the sole issue is the scope of the consent to not allow the testimony of the physician who actually had the informed consent discussion with the patient. Again, Grant and Hernandez talk about that at length. On point two, the directed verdict was prejudicial error for the court to grant a directed verdict during trial on the issue of causation. Again, it is uncontroverted that Illinois case law, that directed verdict is a question for the jury. I'm sorry, causation is a question of fact for the jury to determine. Dr. Gillen was deprived of his right to allow the jury to decide that. As cited in our briefs, both the Thomas case and the Baker case are directly on point. There, the trial court granted directed verdicts, and those cases were both reversed, just like this case needs to be reversed. Contrary to the plaintiff's contention in their brief, or at least the contention of the brief, the testimony of the sole witness in this case was not uncontroverted, was not unchallenged, was not unimpeached. It was absolutely challenged at the trial level. It was challenged with the evidence that was available despite the other evidentiary rulings. And even in that, it was still under the province of the jury to determine the credibility of that one witness and decide, and the jury should have decided, whether there was causation in this case. Even the plaintiff's sole expert acknowledged, as on page 369 of the transcript, as cited in our brief, even the plaintiff's expert acknowledged something else could have happened. So the jury was entitled to make that determination, and the jury was actually required to make that determination. On our third point of error, the refusal to allow us to cross-examine the expert on materials that were in evidence, medical records that were stipulated to, again, directly on a point the case decided in our brief. The past case specifically states that you can cross-examine an expert on materials that the expert has not reviewed. In this case, the expert did review these materials. She acknowledged that she reviewed these materials. She simply chose to ignore them. The Piano case is directly on point there, stating that you can cross-examine an expert on materials that they have not relied on. It defeats the essence of cross-examination if you are not allowed to challenge the expert on other matters outside of where they agree. And again, it's axiomatic Illinois law that on cross-examination, a party is entitled to wide latitude on that cross-examination. Our fourth point of error, it was prejudicial to not allow Dr. Gillen to present medical records in evidence at trial. The medical records were stipulated to by the plaintiffs. They were stipulated to as medical records met the medical records foundational issue, and there was no other obstacle to their admittance. They should have been allowed to be shown to the jury, and we should have been allowed to cross-examine the expert with those records. The fifth point of error is the prejudicial exclusion of Dr. Gillen's opinions. The Rule 213 talks about both disclosures in the formal plea and the discovery deposition. In this case, there were opinions that Dr. Gillen expressed in his discovery deposition. The court refused to allow Dr. Gillen to express those very same opinions at trial. That is prejudicial, and this court in the Morgan case itself stated that disclosure in a deposition is sufficient. And then on our sixth point of appeal, it was prejudicial error not to allow Dr. Gillen, who was in the operating room and taking care of this patient, to not allow Dr. Gillen to testify about facts that he observed as an eyewitness. Both the Seed case and the Jones case make the distinction that disclosure rules, 213 rules, don't apply when we're talking about factual testimony and factual evidence that should be presented to the court, to the jury. So for all those reasons, Dr. Gillen was deprived of his right to a jury trial, and the case needs to be reversed so that that right can be reinstated and Dr. Gillen can have a jury decide this case. All right, thank you, counsel. Mr. Bartholomew. Good morning, again. May it please the court. I'd like to start, I mean, there was nothing about the trial that Mr. Manana believes was appropriate for his client. I'd like to at least briefly go back and explain the factual and procedural background of the case, because it wasn't just Judge Gleeson. There were three circuit judges that ruled in similar fashion as it relates to whether or not Janet Brown appropriately consented to the anesthesiology group going into her pulmonary artery. Mrs. Brown was going to have bypass surgery. This was not an emergent situation. The testimony was that it was always going to be a swan-gance catheter. And the reason we're here is because, unfortunately for the anesthesiology group and for the hospital, they never updated their consent forms. They were using old consent forms for what anesthesia was now doing, which was a pulmonary swan-gance catheterization. And there was a lot of testimony before the court, all three judges, that this is truly a different procedure than a central venous line. The risks associated with a swan-gance catheter are much more significant than a central venous line. That was undisputed. At every point of the proceeding, there's nobody who testified that an injury to the pulmonary artery is reasonably likely to be a complication in a central venous line procedure. Different chapters in books, different billing procedures, a different catheter is used in order to perform a swan-gance catheterization. Dr. Gillard, the defendant in this case, made a judicial admission that obviously an injury to the pulmonary artery is unique to the swan-gance catheterization and not unique to the central venous line. You just don't go that far. The difference in the procedure essentially is that the catheter for the swan-gance catheter goes all the way through the heart. So there's the potential for injury to the heart. But more importantly, it lays men in the pulmonary artery where they inflate a balloon in order to monitor the pressures in the heart function during the bypass procedure. What happened to Janet Brown here is when they inflated the pulmonary catheterization of the swan-gance catheter, they injured the pulmonary artery. There was blood that was detected in the endotracheal tube immediately. Dr. Bailey, who is a cardiothoracic surgeon, recognized immediately that something had happened and the only way you get blood there is if it came from the pulmonary artery. He then calls in his partner, who believe it or not has a name of Dr. Soon, who comes in and they try to find this injury to the pulmonary artery. What happens in a bypass procedure is the lung and the pulmonary artery, the blood is being bypassed. It's going through the machine. The air and lung, the blood and the air are circulating through the machine and so they're not circulating through that pulmonary artery. After the procedure, when she is taken off the heart-lung machine, blood is going through the pulmonary artery and the catastrophic result occurs as a result of the blood. We originally filed a motion for summary judgment, Judge Lesheen granted, and it's very important because you'll note there was never an issue when the summary judgment was granted as to the scope of the consent. In particular, Judge Lesheen says in his order, the defendant is not claiming that this procedure, the swan-gance catheterization, is substantially the same as a central venous line. Nobody has claimed that. They want to say all these wonderful things. If you look at the disclosures, there's not one disclosure that says that because you can't. Nobody can truthfully, no anesthesiologist or physician can truthfully make that statement. It was always undisputed that this is a different procedure, most importantly because the risks are different. And that's the only important distinction to be made as it relates to the scope of the consent. So Judge Lesheen specifically entered the order on the summary judgment initially and said, they're not even contesting that this is the same procedure. And they're certainly not contesting that this was some sort of emergency that occurred because they had always planned to do the swan-gance catheterization. We're in this predicament because they just used the wrong consent, plain and simple. And that's okay unless there's a problem. And here there was a problem. And they got caught. And they had to pay for it. And that's what happened in this particular instance. Now Judge Lesheen, the only reason he vacated his summary judgment is because the defendant then produced the testimony of Dr. Bishop, who didn't recall any conversation with Ms. Brown, who didn't obtain a written consent from the swan-gance catheterization. But Judge Lesheen thought that that was probably an exception to the Dead Man Act to allow testimony of Dr. Bishop, who was not a defendant in the case and who did not do the procedure. What happened after that is that we were able to find statutes in Illinois and federally that says, ah, you don't get to have a moral consent under Illinois law. And that is just the law. And in fact, it's the law across the country. Unless it's an emergent situation, the law is that it has to be a written consent. So your position is that for medical battery claim, there has to be written consent. Is that your position? My position is exactly that. In a non-emergent situation, under Illinois law and under federal law, there has to be a consent for the procedure. There's no exception to it. Unless you're talking about an emergency that develops in the middle of the procedure where the doctor has to do something to save the life of the patient. That is just the law, plain and simple. That is undisputed. It has always been undisputed. And it's important. So when Judge Quito then had the case, and he ruled on the motion in Lemonet, that I find that there has to be a written consent here. Because it's not an emergent situation. They were always planning to do the Sloan-Ganz catheterization. And it is unequivocal that they did not have a consent for the Sloan-Ganz catheterization. Now, the defendant tries to argue that, oh no, this was a matter of expert testimony and that we had three experts who were going to testify that the Sloan-Ganz catheter was substantially the same procedure as the central venous loop. That is completely wrong. Number one, recall, they never claimed it was substantially the same procedure. Judge Lasheen found that specifically. They never claimed it. Secondly, if you look closely at the disclosure of their only expert who they made the disclosure of, a 213 disclosure, he talks about the insertion is essentially the same. He doesn't talk about the procedure being the same. And he readily admits, as everybody did, that the Sloan-Ganz catheter has that very important risk associated with it, which is injury to the pulmonary artery. So we're not talking about a situation where this was a lesser included procedure. So, for example, in the process of doing the Sloan-Ganz catheterization, had there been an injury to the vein that they went into when they were bleeding or something like that, well, then you can make the argument that this is the lesser included and it's obviously the same procedure because you're doing the same thing. But recall, the Sloan-Ganz catheterization is entirely different. It's a different catheter and it goes through the heart into the pulmonary artery. And Mrs. Brown never consented to that occurring. Just didn't. And you may think to yourself, well, what a technicality. What are we doing here? She probably would have consented had she properly been given the consent form, and you're probably right. But unfortunately, that's not the law in Illinois. This is a medical battery. They had no excuse for not obtaining her written consent to a Sloan-Ganz catheter. They do it now. If you look at the forms that are in evidence in this case, you see very specifically Sloan-Ganz catheterization and all of those added risks associated with that particular procedure. So we have three judges, three circuit judges that all made the same ruling based on the evidence, that there was no question of fact that this was not consent for a Sloan-Ganz catheterization. It is not the same procedure. There is no dispute about that. But nobody came in to say that there is an injury or potential injury to the pulmonary artery that can occur in anything other than the Sloan-Ganz catheterization. And that's why so many judges were consented, and it was appropriately entered in this case. Because there is never going to be any testimony from anybody who is going to say that there is a risk of injury that's similar as it relates to the Sloan-Ganz catheter, as it relates to the central venous line. Plain and simple. The arguments that they're making as it relates to the evidence, Mr. Manana, the morning of trial, fell on his sword specifically and told the court that his 213 disclosures were inadequate. They were inadequate in all regards. He never disclosed opinions about Dr. Gillen. And if he was going to call Dr. Gillen as an expert witness, he was required to do that. He never disclosed appropriate opinions from Dr. Truman as it relates to the causation issue. Just not even there. You can look at the disclosure, completely absent, and he admits it. He admits it. And so the court at that point denied their motion for a continuance, and he admittedly did not have proper disclosures of his experts. And so the court was not going to allow him to bring experts into court who had not properly disclosed his opinion. And no excuse for it. There was absolutely no excuse for what he did, other than he was following Missouri rules as opposed to Illinois rules as to the disclosure of his expert witnesses. And recall, Dr. Truman testified that the risk of a pulmonary artery injury occurs in a slung hand scatheter, not in a central venous line. Plain and simple. So, and in fact, even if you go past that, if you look at Dr. Truman's deposition, he had no opinion. I asked him specifically, do you have an opinion to a reasonable degree of medical certainty as to whether or not the injury to the pulmonary artery caused or contributed to cause the death of Mrs. Brown? He said it did contribute to it, as everybody would say in this particular instance. So, no dispute that there was not a proper consent. No dispute that the consent somehow should be read to include a slung hand scatheter with the added risk of a slung hand scatheter. No dispute that there was no causation evidence presented by the defendant, nor could they present it. And they did raise a red herring as it relates to one witness. What they tried to do a few weeks before trial is to obtain the, or to obtain the services of one of the experts named by other than the defendants, who had been deposed, Dr. Jacobson. Unfortunately, the court never had to rule on whether or not their little line at the end of their disclosure that we can adopt any expert that was named by somebody else. The court never reached that issue. That's why it's a red herring, and I want to point it out because it's in the brief. The court never reached that issue because Dr. Jacobson could never be made available for trial. So they weren't able to bring Dr. Jacobson in. The court never had to rule as to whether or not Dr. Jacobson was a proper disclosed expert from a defendant who didn't retain him and only used the one line. Kind of broad catch-all, we can use anybody else. More importantly, if you look at the deposition of Dr. Jacobson, Dr. Jacobson again says that in his opinion, or he says he can't say that the injury to the pulmonary artery caused or contributed to cause death. He can't say that it wouldn't have caused death. So, undisputed facts. Wrong consent. Undisputed facts. Pulmonary swan dance catheter has nothing to do with the central venous line. Undisputed facts. They didn't have anybody to testify as it relates to consultation. Plain and simple. Undisputed facts. The only witness that the jury heard was Dr. Nanduri, who was not a retained expert on behalf of the plaintiff. This isn't my expert, who certainly could be cross-examined about documents. This was the pathologist at the coroner. My client didn't order, didn't get, didn't order an autopsy, didn't request an autopsy, per se. This was a coroner who came in and ordered an autopsy. And Dr. Nanduri, who is a pathologist who does the autopsies in St. Clair County, was the one who came in. Her opinion was, there was an injury to the pulmonary artery. That was undisputed. There was no testimony ever going to be presented to anybody that there wasn't an injury to the pulmonary artery. In fact, Dr. Suen, you recall Dr. Suen is a doctor that Dr. Daly brings in to figure out what happened to this poor lady. A mother of blood and endometriosis. Dr. Suen comes in and after she dies, actually gets there before when they're trying to resuscitate her, he opens up her chest while she's still alive and discovers that there's blood everywhere, as you can imagine. And then after she passes, he takes it upon himself to do his own little autopsy without any consent of the family and puts an incision into the chest and discovers that there is a hole in the pulmonary artery, the same hole that is found by Dr. Nanduri, the pathologist that rendered her opinion. So they're arguing about, number one, Dr. Nanduri should have been able to be cross-examined about records she never provided. Well, that's not the standard anymore. If she had been a retained expert, it would be different. This is a doctor whose opinions had nothing to do with the lawsuit. These are opinions that she had arrived at based on her autopsy of the patient. It was clear that the records that they were trying to use to impeach her, she had never relied upon. She had never even seen. And so the court said that you can't cross-examine someone on records they haven't relied upon. This isn't a retained expert. This is a doctor, pathologist who did the autopsy. So it's clear it's certainly not an abuse of discretion by Judge Gleason in not allowing those records to occur. The opinions of Dr. Gillen, you know, you can see again in the 213 disclosure, admittedly by Mr. Nanduri, there is no disclosure of Dr. Gillen's opinions. The reason Judge Gleason wouldn't allow him to testify as to what he observed during the procedure is because there was no question of liability because he had already ruled on sovereign judgment. So what would be the issue in front of the jury as to what was happening in the procedure really was irrelevant. So that issue is a non-issue again. So, you know, it's an unfortunate situation here. And, again, you want to step back and say, well, you know, Mrs. Brown in all likelihood probably would have consented to assaulting Anne Scather had it been properly presented to her. But she didn't. And when you have an injury to a body part that you never consented to, that's a medical battery. Recall, this is a medical battery case and not a medical malpractice lack of consent case. It's plain and simple. No consent, you're in trouble. And that's what happened here. And this is here for not Mrs. Brown necessarily, but for all the other patients in the state of Illinois who the law requires that there be a procedure that is documented and discussed with the patient in written form and the patient signs it. Absent an emergency situation, either because of surgery there's not enough time to do it or during the surgery something happens. That's the law. It's plain and simple. And they can't suggest that it's not the law. And they can't suggest that a Swan-Gillis catheterization is the same as a central venous line. And if you look specifically, you'll see the same thing that all the circuit judges did. They are not saying it. They didn't say it to begin with. They didn't even argue it to begin with. And then they tried to, despite their, their, the admissions before, they tried to get around us with some fancy language. But these were their retained experts and their clients. And they still couldn't get them to say the magic language that would allow us to go to the jury that yes, a Swan-Gillis catheterization is substantially the same as a central venous line. They can't do it because different billing, different catheter, different place in the body. Plain and simple. You can't go in and do consent for an angiogram and then say, oh, by the way, we're going to do bypass surgery because. But the Swan's GANS is inserted through the CVP, isn't it? I'm sorry? Isn't the Swan's GANS catheter inserted through the CVP? Yes. The same cath, a different catheter. They go through the same line. But the difference is the Swan's GANS catheter goes through the heart and therefore has all the attempting complications of going through the heart that the central venous line never does. The central venous line stops. The monitor they put in for that stops on the one side of the heart. It never goes through the heart. And most importantly, it never goes into the pulmonary artery. And there's not a balloon. I mean, this is a particular different device altogether. And that was presented to the circuit court. This is a different device altogether. The insertion, that's what they want you to say. The insertion is the same. The insertion is the same to do an angiogram on a patient as it is to do angioplasty in a stent. And nobody could stand up here and argue to you that, well, we have appropriate consent to do an angiogram, but we decided to put a stent in this patient and we punctured the artery and the patient died. Go in the same way. You do. But that doesn't mean that it's the same procedure. Stenting, angioplasty, much different than an angiogram. And the risks associated with it are much different than an angiogram. And, you know, they want to make the argument, well, the function of it is the same. We're trying to monitor the patient's pulmonary blood pressure. But again, we're like saying the bypass is the same as a stenting procedure or a bypass is the same as an angiogram. It just didn't occur. For these reasons, we ask you to affirm the holdings of the circuit court. All right. Thank you, Mr. Bartholomew. Mr. Manana, rebuttal. Tell us, Mr. Bartholomew, tell us about what Mr. Bartholomew characterized as you falling on your sword at the beginning of the trial about disclosures. There was Dr. Jacobson. It's not a point of appeal in our brief, but I'm happy to talk about it. Dr. Jacobson was an attorney, I'm sorry, an expert retained by the co-defendants, one of the co-defendants. And when the co-defendants were dismissed, we asked Dr. Jacobson if he would still testify. He said he would. And he was going to testify on either Thursday or Friday of trial. And when the summary judgment was granted and no testimony or evidence would be in the case relating to liability, the trial was then going to be shortened to Wednesday. And Dr. Jacobson couldn't testify. So was that discussion only about Dr. Jacobson? That one was about Dr. Jacobson. There was discussion on other disclosures. For example, Dr. Gillen, I acknowledge, and I don't know if that's what he means, but I acknowledge that Dr. Gillen's 2013 disclosure did not have opinions. But the Rule 13 states that the opinions disclosed in either disclosure or the discovery deposition. So I would certainly dispute if he's trying to make that all encompassing. It certainly is not. I heard him say undisputed or no dispute. I lost count about six or seven times. And there's absolutely things that are disputed here. What he just gave is a great closing argument. And if he wanted to make that exact same argument to the jury, that would be entirely appropriate. In fact, that's what should have happened. He should have made that argument to the jury. But the points of error we have in our appeal and this appeal doesn't have anything to do with all the other patients in Illinois. It doesn't have anything to do with Dr. Jacobson. It doesn't have anything to do with Dr. Seward. It has to do with what happened in this case. He spent time talking about Dr. Lachine. He's talking about Judge Lachine. Judge Lachine's vacated order because Judge Lachine didn't have all the information. When Judge Lachine had all the information, the order was actually entered in this case. Judge Lachine specifically said there is a question of fact here for the jury. And I cannot grant summary judgment. That is where Judge Lachine entered. Just to make sure I understand, that was based upon the oral testimony of a doctor who said he gave oral instructions and received oral consent. And, yes, and it's also based on the testimony of three doctors. We submitted affidavits of three doctors who, and this is a quote from Dr. Tumans, Gillen and Dr. Tumans are virtually identical where he specifically says, talking about the swan gans and the central venous pressure, I'm quoting, this is in paragraph six of his affidavit, the procedures are complementary and or part and parcel of one another. Nobody's saying they're identical, but the law doesn't say they have to be identical. The law says there has to be substantial variance. And we had the testimony of three doctors who were going to say, and did say in affidavits and would have testified to the jury, that these are substantially the same. They go in, they're used together in the procedure. They go in the same incision in the patient. One goes a little farther than the other. Did those doctors say that the risks are the same? No. Isn't that what the purpose of consent is to say I acknowledge the risk? No, not in a negligence case. Yes, Your Honor, if this was a negligent informed consent case, you'd be absolutely correct. But this is a battery case and the case law is absolutely clear. The risks don't have anything to do with it. It's the procedures themselves. Now, what is going on here is these procedures are substantially variant. So there are some different risks, but there are many identical risks. And again, that has nothing to do with this case. If he wanted to make that argument to the jury, he could. But that's not proper for summary judgment. Summary judgment says you look at all of the evidence in the light most favorable to the non-moving party, which is the defendant. Look at all of our evidence. We have three doctors who are saying that these procedures are substantially the same. They are part and parcel of the same procedures. And there is no substantial variance. And therefore, there's no battery and there was appropriate consent. The written law that he refers to is about Medicare payment. It has nothing to do with evidentiary law in Illinois and what is or is not allowed in court. Again, this 5th District in Grant and Hernandez both discussed at length the oral testimony of the physician who gave the informed consent discussion. All right. Thank you, Mr. Manning. And thanks to both counsel for your briefs and arguments. They're all very good. We're going to take this matter under advisement and issue a written decision in due course.